UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| AARON LEWIS,<br><br>*Plaintiff*,<br><br>*v.*<br><br>MARK KOHLER, SECRETARY OF THE STATE,<br><br>*Defendant*. | Civil No. 3:22-cv-01225(JBA)<br><br>November 3, 2022 |

**RULING DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff is a member of the Libertarian Party of Connecticut ("LPCT") who is running for Governor. Plaintiff petitioned to be on the statewide ballot this year and also signed the petition. Plaintiff contends that the petition process denies Plaintiff substantive and procedural due process (Count One), disfavors parties that are not major or minor parties in violation of the Equal Protection Clause (Count Two), compels political speech and association in violation of the First and Fourteenth Amendments (Count Three), and is racially discriminatory in violation of the Equal Protection Clause (Count Four). (Compl. [Doc. # 1].) These claims are brought against Defendant Secretary of the State under § 1983. Plaintiff has moved for a preliminary injunction [Doc. # 8], seeking a mandatory injunction requiring Defendant to grant Plaintiff's petition to appear on the ballot. For the reasons given below, Plaintiff's motion is DENIED.

**I.    Background**

1

Connecticut distinguishes between major parties, minor parties, and all other parties when determining ballot access.[1] A major party is "a political party or organization whose candidate for Governor at the last-preceding election for Governor received . . . at least twenty per cent of the whole number of votes cast for all candidates for Governor, or . . . a political party having, at the last-preceding election for Governor, a number of enrolled members on the active registry list equal to at least twenty per cent of the total number of enrolled members of all political parties on the active registry list in the state." Conn. Gen. Stat. § 9-372(5). Major party state primaries are held on the second Tuesday of the August preceding the election. Conn. Gen. Stat. § 9-372(5). A minor party is "a political party or organization which is not a major party and whose candidate for the office in question received at the last-preceding regular election for such office . . . at least one per cent of the whole number of votes cast for all candidates for such office at such election." Conn. Gen. Stat. § 9-372(6). Minor parties must make their nominations by 62 days before the election (September 7, 2022). Conn. Gen. Stat. § 9-452.

Candidates who do not have access to the ballot through the major or minor party rules must petition to have their name printed on ballots and must petition for each race rather than for complete ballot access for the party as a whole, although a single petition can list multiple offices. Conn. Gen. Stat. § 9-379. (Carini Decl. [Doc. # 13-1] ¶ 25). Their petitions must be signed by the lesser of "(1) one per cent of the votes cast for the same office or offices at the last-preceding election . . . or (2) seven thousand five hundred." Conn. Gen. Stat. § 9-

---

[1] At oral argument, Plaintiff offered extensive critiques of the dominant two-party system and separation of parties into major and minor parties, arguing that the dominance of the Republicans and Democrats forces voters to select candidates who may not truly reflect their views, excludes the many Connecticut voters who are not affiliated with any party, and prevents the rise of parties that might better represent voters' interests. The policy issue of whether Connecticut's current electoral process is the best way to ascertain party support and conduct an election is distinct from the legal question before the Court of whether the petition laws are constitutional.

453d. For a non-special election, the petition filing deadline is 90 days before the election (August 10, 2022). Conn. Gen. Stat. § 9-453i(a).[2]

For the 2022 election, Defendant began issuing petition forms to candidates on January 4, 2022. (Carini Decl. ¶¶ 23.) Harold Harris, the libertarian petition candidate for Secretary of the State, requested petitions for himself and the other LPCT candidates, including Plaintiff, in late February. (*Id.* ¶¶ 10, 24-25.) When the petitions were provided, Mr. Harris was notified that the deadline for submitting petitions was August 10, 2022 and candidates for statewide office, including Plaintiff, would need 7,500 signatures to attain ballot access. (*Id.* ¶ 25.) The LPCT submitted petition pages for statewide offices, including governor, but submitted only 818 signatures for the statewide offices, well short of the 7,500 required. (*Id.* ¶ 30.)

As of October 24, 2022, Plaintiff maintains that neither he nor Mr. Harris had been told by Defendant whether he qualified for the ballot or not. (Lewis Aff. [Doc. # 15-1] ¶ 29; Harris Aff. [Doc. # 15-3] ¶ 17.) Plaintiff alleges that Defendant's custom has been to wait until after the minor party nomination deadline to officially determine whether minor parties and petitioning candidates have qualified for the ballot, making it impossible for minor parties and petitioning candidates to challenge the official determination. (Compl. ¶ 8.) Plaintiff also offers a declaration from Mr. Harris stating that he has received no communication about the

---

[2] The petition process continues as follows. After filing, the petition circulator must sign the certifications detailed in § 9-453j with respect to each page/signature and cross-reference the petition names with the list of registered voters. Conn. Gen. Stat. § 9-453k. The town clerk of each town or city then must then file the certified petitions with the Secretary of the State within two weeks of receiving them. Conn. Gen. Stat. § 9-453n. The Secretary of State further reviews the list and must approve petitions that have sufficient signatures, although approval shall be withdrawn if sufficient signatures are withdrawn; for a non-special election, signatures may be withdrawn at any time before the petition filing deadline of 90 days before the election (August 10, 2022). Conn. Gen. Stat. §§ 9-453o(c), 9-453h, 9-453i(a). By September 15th, the Secretary of State must mail to each town clerk a list of the nominated candidates for each election. Conn. Gen. Stat. § 9-462. After the list is mailed, the town clerk must begin immediately preparing ballots. Conn. Gen. Stat. § 9-135b(a).

ballot status of any LPCT candidates. (Harris Aff. ¶¶ 17, 20.) Defendant represents that 1) parties can call the office of the Secretary of the State ("SOTS") and inquire about ballot access at any point, which neither Plaintiff nor anyone else affiliated with the LPCT did, and 2) on September 12, 2022, SOTS sent a letter to Mr. Harris stating that LPCT had failed to get enough signatures for its statewide petition candidates. (Carini Decl. ¶¶ 21, 31, 35).

Several other parties successfully petitioned for ballot access this year. The Independent Party petitioned on to the ballot for 2 state senate districts and 8 state assembly districts. (*Id.* ¶ 37.) The Working Families Party petitioned on to the ballot for 2 state senate districts and 16 assembly districts. (*Id.*) The Green Party petitioned on to the ballot for three state senate districts. (*Id.*) These parties also, like the LPCT, had automatic ballot access for certain positions. (*Id.*)

## II.  Standard

> To obtain a preliminary injunction against governmental action taken pursuant to a statute, the movant has to demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction. The movant also must show that the balance of equities tips in his or her favor. When the plaintiff seeks a mandatory injunction, the standard is particularly exacting: a district court may enter a mandatory preliminary injunction against the government only if it determines that, in addition to demonstrating irreparable harm, the moving party has shown a clear or substantial likelihood of success on the merits.

*Libertarian Party of Conn. v. Lamont*, 977 F.3d 173, 176-77 (2d Cir. 2020) (internal brackets, citations, and quotation marks omitted) (hereafter "*Lamont*").

## III.  Discussion

### A. Equal Protection and Free Association Claims

Plaintiff first challenges the entirety of the statutory petitioning scheme, alleging that the petition laws impermissibly burden his First and Fourteenth Amendment rights by

4

treating minor parties and petition candidates less favorably than major parties. (Compl. ¶¶ 45-51; Pl.'s Mem. [Doc. # 13] at 9-10.) When considering state actions restricting ballot access, courts use the two-step *Anderson-Burdick* framework. *Yang v. Kosinski*, 960 F.3d 119, 129 (2d Cir. 2020). The Second Circuit has described the inquiry as follows:

> [f]irst, we ascertain the extent to which the challenged restriction burdens the exercise of the speech and associational rights at stake. The restriction could qualify as reasonable and nondiscriminatory or as severe. Once we have resolved this first question, we proceed to the second step, in which we apply one or another pertinent legal standard to the restriction.
>
> If the restriction is reasonable and nondiscriminatory, we apply the standard that has come to be known as the *Anderson-Burdick* balancing test: we must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate, and then . . . identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment under this more flexible standard, we must determine both the legitimacy and strength of each of those interests and the extent to which those interests make it necessary to burden the plaintiff's rights.
>
> If the restriction is severe, then we are required to apply the more familiar test of strict scrutiny: whether the challenged restriction is narrowly drawn to advance a state interest of compelling importance. It follows then that the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged restriction burdens First and Fourteenth Amendment rights.

*Id.* (internal quotation marks and brackets omitted). A severe restriction is one that results in "exclusion or virtual exclusion from the ballot," such that even a "reasonably diligent candidate" could not be expected to qualify for the ballot. *Lamont*, 977 F.3d at 177.

Plaintiff challenges the facial validity of the petition requirement for candidates not affiliated with major or minor parties (Pl.'s Mem. at 4-5, 9-10) and challenges the petition laws as applied in light of the difficulty of gathering petitions especially during the COVID-19 pandemic, the cost of gathering petitions, and the difficulty of campaigning before ballot access is determined in September—obstacles not encountered by major party candidates.

5

(Pl.'s Mem. at 3-5, 9-10.) Defendant argues that the Second Circuit and the Connecticut Superior Court have already held that the petition laws are facially constitutional in *Lamont* and *Misbach v. Merrill*, No. X03-HHD-CV19-6118097S, Memorandum of Decision (Conn. Super. Ct. Apr. 30, 2021), and nothing has changed since those decisions that would call their holdings into question. (Def.'s Opp'n at 16-17.) Additionally, he argues that the fact minor parties routinely achieve ballot access, including through the petitioning process, demonstrates the reasonableness of the petition laws. (*Id.* at 17.) Regarding Plaintiff's as-applied challenge, Defendant argues that because Plaintiff has not submitted any concrete, specific evidence of how the petition laws or COVID-19 have specifically impacted his petition-gathering efforts, he has not met his burden to show that the petition laws as applied severely burden his right. (*Id.* at 20-22.)[3]

The affidavits Plaintiff has submitted are largely devoted to critiques of the existence of the petition process as a whole. They argue, for example, that the petition laws "have actively prevented [the LPCT] from retaining and expanding all kinds of institutional knowledge because we must constantly focus on petition drives" (Reale Decl. II [Doc. # 15-4] ¶ 9), "the petitioning process for the Libertarian Party and all third parties is highly prejudicial, cumbersome, and not designed to help parties get on the ballot" (Harris Aff. ¶ 13), "[t]he balloting process is discriminatory and works against equal representation in the State of Connecticut" (Jennings Aff. [Doc. # 15-2] ¶ 21), and "[t]he [petition] process is designed to bar access to the ballot to maintain control within the two-party system" (Lewis Aff. ¶ 21). However, notwithstanding these critiques, as a matter of law the Second Circuit

---

[3] Defendant additionally argues that the defense of laches would bar injunctive relief because Plaintiff waited until two weeks after the first ballots were printed to file his complaint, and then waited another two weeks to move for a preliminary injunction, despite the fact that by the end of February Plaintiff had been notified of all the petition requirements and would have been aware of the impact of COVID-19 on the petition-gathering process. (Def.'s Opp'n at 23-24.) The Court does not reach this issue because Plaintiff has failed to show a clear likelihood of success on the merits of his claim.

6

has held Connecticut's petition process to be facially constitutional. *Lamont*, 977 F.3d at 179. In *Lamont*, the court explained that "Connecticut's signature requirement does not impose a severe burden on First and Fourteenth Amendment rights because a reasonably diligent candidate could be expected to satisfy the signature requirement," and significantly more onerous signature requirements have been upheld by the Supreme Court and the circuit courts. *Id.*

As to Plaintiff's as-applied challenge, Plaintiff has not shown that the petition laws severely burden him. He argues that COVID-19 has reduced the hours of Town Clerks and Registrars, which has made it more difficult to comply with the petition laws, and the pandemic has made it harder to reach people during their commutes or at large events. (Compl. ¶ 15, 19.) However, while Plaintiff's affidavit sets out his views that the petitioning system is burdensome and unconstitutionally discriminatory, Plaintiff does not provide any description of his own petition campaign: the strategy for attempting to gather signatures, affidavits from signature-gatherers, or comparisons of this campaign to prior petition campaigns, that would permit evaluation of the impact of COVID-19 on Plaintiff's petition-gathering process. *See Libertarian Party of Conn. v. Merrill*, 470 F. Supp. 3d 169, 185 (D. Conn. 2020) (finding "unconvincing" evidence that petition laws severely burden ballot access where plaintiffs "adduce[d] very little evidence based on the actual experiences of . . . candidates during the current election cycle"). The same is true of Plaintiff's contention that the cost of gathering signatures for petitions is prohibitively high. (Pl.'s Reply [Doc. # 15] at 7-8.) Plaintiff's evidence consists of the cost of paid petition-gatherers in Indiana and the fact that there have been no victorious Connecticut statewide candidates who attained ballot access through the petition process. *Id.* However, the Indiana campaign is of limited relevance to the Court's assessment of Plaintiff's campaign, and Plaintiff's only evidence that using paid petition-gatherers, rather than volunteers, is a necessity rather than a campaign choice is a broad statement about what the petition gathering process entails. (Reale Decl. II

¶ 15.) The fact that petition candidates have not been successful in Connecticut statewide elections also is not persuasive. Plaintiff's challenge concerns ballot access, not electoral success, and since the 2016 election, several candidates have successfully petitioned onto the ballot for statewide elections. (Carini Decl. Ex. B.)

Regarding Plaintiff's argument that the late deadline for petitions to be filed and validated burdens his ability to campaign, this burden also appears to be minimal. Plaintiff remains free to campaign throughout the entirety of the petition process. When the Supreme Court has considered whether filing deadlines violate the Constitution, it has found that excessively *early* deadlines unconstitutionally burden candidates' and voters' rights. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983) (finding that Ohio's March filing deadline for presidential candidates was unconstitutional). Additionally, under Connecticut's ballot access laws, both major and minor parties alike can have their candidacy revoked for procedural defects. For example, in *Butts v. Bysiewicz*, 298 Conn. 665 (2010) a Democratic candidate who failed to comply with a filing deadline did not have his place on the ballot decided until the Connecticut Supreme Court ruled in late October that he would not appear on the ballot.

As Plaintiff has not shown that his rights are severely burdened, the next step of the *Anderson-Burdick* analysis is to balance "plaintiffs' asserted First Amendment injuries against the precise interests put forward by the State as justifications for the burden imposed by its rule," *Merrill*, 470 F. Supp. 3d at 185 (internal quotation marks omitted). When there is no severe burden, "the State's reasonable and nondiscriminatory restrictions will generally be sufficient to uphold the statute if they serve important state interests." *Price v. Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008). Defendant asserts that the petition laws are justified by the state's interest in regulating its elections so that they may proceed in an orderly manner, *Burdick v. Takushi,* 504 U.S. 428, 433 (1992), and in ensuring that candidates who appear on the ballot have made "some preliminary showing of a significant modicum of

8

support before printing the name of a political organization's candidate on the ballot" in order to "avoid[] confusion, deception, and even frustration of the democratic process at the general election," *Jenness v. Fortson*, 403 U.S. 431, 442 (1971); (Def.'s Opp'n 13-14.)

Weighed against these interests, the Connecticut petition laws have not been shown to unconstitutionally burden Plaintiff's rights. As the Second Circuit recognized when rejecting an as-applied challenge to the petition laws at a time of significantly more severe COVID-19 impact, including a stay-at-home order, "the State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates," and "signature requirements are an appropriate means of vindicating that interest." *Lamont*, 977 F.3d at 181 (internal brackets omitted). Furthermore, the United States Supreme Court has upheld far more onerous signature requirements than that faced by Plaintiff. In *Storer v. Brown*, 415 U.S. 724, 740 (1974), the Court upheld a California ballot access law that required collecting within 24 days a number of signatures equivalent to five percent of the vote in the last general election, a far more onerous signature collection effort than that required of Plaintiff. The Court also upheld a Texas law that required a gubernatorial candidate to gather 22,000 signatures to appear on the ballot. *Am. Party of Tex. v. White*, 415 U.S. 767, 778 (1974). While the larger budgets and membership of other parties may well make it easier for their candidates to move through the petition process than for Plaintiff, "the very purpose of the petition alternative is to separate candidates on the basis of their support. This is a legitimate purpose and not unconstitutional discrimination." *LaRouche v. Kezer*, 990 F.2d 36, 41 (2d Cir. 1993).

Finally, the relief that Plaintiff seeks would contravene these state interests by placing Plaintiff on the ballot without a showing of a degree of support, an outcome that would result in preferential treatment relative to other petition candidates and go against the state's

"important interest in ensuring that all minor parties are treated fairly." *Merrill*, 470 F. Supp. 3d at 186.

Plaintiff has therefore also not shown a substantial likelihood of success on his as-applied challenge to the petition laws.[4]

### A. Due Process Claims

Plaintiff claims that the late date at which the Secretary determines whether petition candidates have achieved ballot access and the fact that no one involved in Plaintiff's petition process has received any notice this year of whether they will be on the ballot violates his procedural and substantive due process rights. (Compl. ¶¶ 38-44; Pl.'s Mem. at 7-9.)

"[T]o establish a violation of either substantive or procedural due process, plaintiff must initially show that she was deprived of a property or liberty interest. Thus, [the Court's] threshold inquiry is whether plaintiff had a constitutionally protected property or liberty interest." *Gordon v. Nicoletti*, 84 F. Supp. 2d 304, 308-09 (D. Conn. 2000). In passing, Plaintiff argues that the petition laws deprive him of a liberty interest in running for office. (Compl. ¶ 23.) However, it is well established that there is no constitutionally-protected liberty interest in being an elected official. *See Leroy v. N.Y. City Bd. Of Elections*, 793 F. Supp. 2d 533, 537 (E.D.N.Y. 2011) (explaining that "[t]he Supreme Court has long held that "there is no property or liberty interest in an elected office," citing *Snowden v. Hughes*, 321 U.S. 1, 7 (1944), and collecting cases). Even if Plaintiff is claiming a property interest in ballot access, the existence of such an interest is not established such that Plaintiff can show a substantial likelihood of

---

[4] In addition to his Equal Protection and Free-Association claims, Plaintiff argues that the petition process violates the First Amendment by compelling speech from both the petition gatherers who must ask people to sign and petition signers, who must make political representations to sign. (Compl. ¶¶ 45-51; Pl.'s Mem. at 9-10.) However, this claim is functionally identical to Plaintiff's Equal Protection and First Amendment Claims. Inherent in a petition process is the requirement that voters sign petitions and petition gatherers interact with the signers, notwithstanding any residual COVID apprehension. Thus, while Plaintiff attempts to present this claim as distinct from those above, it is at its heart a challenge to the petition process, which—for the reasons explained above—is constitutional both facially and as applied to Plaintiff.

success on the merits. *See id.* (assuming *arguendo* that ballot position could potentially be viewed as a property interest).

### B. Racial Discrimination Claim

Lastly, Plaintiff argues that the petition laws violate the Equal Protection Clause by having a disparate impact on African-American voters, preventing them from forming their own political parties. (Compl. ¶¶ 57-61; Pl.'s Mem. at 11.) Defendant observes that Plaintiff has provided no evidence of differential outcomes for minor party candidates on the basis of race or of intentional racial discrimination. (Def.'s Opp'n at 19-20.)

At best, Plaintiff offers generalized critiques rather than documentation that the petition laws disproportionately burden the political association of African-American Connecticut residents. (*See* Reale Decl. I [Doc. # 8-4] ¶ 20 (offering his opinion that attaining ballot access "would be a far greater burden on a brand new party that would actually seek to be the political voice of African Americans, who are otherwise forced into the Democratic or Republican Parties to even have an effective voice.")) But even if the Court were to accept this as evidence of disparate impact, Plaintiff's claim would still be unlikely to succeed. "Equal Protection claims under § 1983 cannot be based solely on the disparate impact of a facially neutral policy;" some evidence of discriminatory intent is required. *Reynolds v. Barret*, 685 F.3d 193, 201 (2d Cir. 2012). Plaintiff does not allege any racially discriminatory intent or purpose as required to sustain a § 1983 claim, and thus this claim is unlikely to succeed.

**IV.	Conclusion**

For the reasons given above, Plaintiff's Motion for a Preliminary Injunction [Doc. # 8] is DENIED.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 3rd day of November, 2022